325-0183 Real Estate Naperville, LLC v. E & S Mangament Group, Doing Business as Waterside Center Series, Appellant Cross Appellee Ms. Im, if you're ready to proceed.  Mr. Daniels has an opportunity to to proceed. Mr. Daniels, if you're ready. Good morning, everyone. Thank you for the time. I'm Mark Daniel. With me is co-counsel. I think he's on the alternate channel. Mark Waterquist, who's also a friend, and he's been dealing with this for quite some time. I want to thank the panel, the clerk and staff for their work on this. May it please the court. REN 2's appeal really relates to two narrow issues. The first is the existence of a sign easement, and the second relates to legal fees recoverable under the declaration. I'd like to address a few things that E&S raised during argument. Justice Hedl, I think you hit the nail on the head. We are not guilty of theft. E&S could never establish the first element of trespass, which is an unpermitted access or entry into the property of another. That could never be established at trial. What happened here goes back to 2000. In 2000, Menard Inc. acquired a large tract of land in Naperville. They divided the property into two lots first. That is exhibit P12 and D10. In 2003, they recorded something. 2003 was a pretty big year. Not only did you have the secondary subdivision to create a shopping center, Menard's is lot one. You had a plan development that was approved. A plan development involves the approval of a plat. That is exhibits D11 and P13. With regard to exhibit P13, we have in the appendix at pages 164 to 167 some zoomed in portions of the plat that was approved and recorded in the recorder's office of DuPage County. Also in 2003, there was a grant of easements that was executed. These are public utility easements, not easements that run between the owners. These are grants for NICOR, for drainage, for the city of Naperville, when it comes to access and to any other utilities that come into play. Menard still owned all of it. Menard's planned the subdivision. They decided how they wanted it to be built. They maintained control over construction. They approved construction. They approved sign locations. They approved transformer and utility locations. They were the declarant under the declaration that Justice Davenport asked about Section 5A on. That's Menard's. Everyone after 2003 is a subsequent purchaser. When they bought that land, they bought that land subject to the plats and the declaration, plain and simple. ENS comes along in 2017, 14 years later, and two or three years after that, has to defend this action because they want to disconnect our fire suppression and alarm system. I want to address those with some clarity. The fire suppression system is a system whereby water is fed from the city's water main through what we call a fire main. It goes into a riser, and that water is parked in a system of pipes above the retail space in the shopping center. Does the city charge for that water, Mr. Daniel? The city does charge for that water, but it's not flowing water. It only flows when you have to test it and release a little bit to make sure that the water does flow and there's not a blockage to some part of the system, so it's a fixed system. Well, it's not a closed system. Let's not get into definitions we're not good at. The water does come in, and you do pay for the water in some de minimis fashion, according to you. I do not allege that we pay for it. Someone pays for it. Someone pays for it, yes. So the city does charge for that. With respect to the fire alarm control panel, the fire alarm control panel is wired to a few locations in the building. First, the fire alarm control panel senses whether or not there's an imbalance in the water system. So if a part of the system has a sprinkler go off, the fire alarm is going to go off because the water is moving. It detects that. It also senses for smoke and heat at the different places throughout the shopping center. That system requires electricity for the monitoring purposes. All right. Now, those are just two of the shared obligations. The one thing that ENS and REN2 agree on, fortunately today, is that those are utilities. They are shared improvements that operate to provide an important service to lot two and lot three. And Ms. M testified at trial, this was somewhat difficult because Ms. M was counsel and a witness at trial as the owner, but she testified they were utilities. They were utilities serving both units. So when ENS refers to, I believe it was our riser. The riser may be on their property. But we've got a shared interest in that riser. We have a shared interest in the pipes, no different than they have their shared interest in the drive aisle that crosses our property, the loading zone, the handicapped accessible routes to cross our property, the parking lot lighting, the wall lighting. Mr. Daniel, I think we'd all agree that the pipes that travel underground or the electrical connections that travel underground, no one's arguing about that. Ms. M is arguing that you should have put in your own vault, your own space where all of that stuff would come out of the ground so it could go to the back of your building, not the back of her building. Obviously this happened before she owned the building, but what is your response to that? Article 5A of the declaration clearly provides easements for utilities. That would include the metering system for electricity and gas. That would include the pipe that draws it into the building. Wouldn't it be just the utilities that are underground that it's providing easements for? You're saying it's above ground easements also? It's everywhere in any place, underground, above ground, through walls. There is no limit. This is a shopping center. And you can't have limits because you get into situations like this. And this is exactly why Menard had the declaration. You have someone coming along 17 years after construction to dispute these issues. That's why the easement in Article 5 of the declaration is broad. That's why Judge Hayes properly did not put limits or guardrails on the easement in addition to what Menard had already planned for. That's not for the court to do at bench trial. And in this instance, Article 5 is very clear. It grants easements for those utilities. Now the transformer is a device that is within a vault. And Ms. Im says we need to create our own vault. That's not true. And the judge found that based on the testimony of witnesses at trial, that that was not the case. Under the circumstances, you had Tom Sinek, you had Naperville electrical staff, utility staff, because it's a Naperville utility. They all testified that this was properly done. The other thing that I'll note is when it comes to properly done, coming along in 2017, after you receive a special warranty deed that notes all these items in the title history, every plat, every ordinance could have been traced through that. Ms. Im, when she drove by the property, she testified that she saw the sign on Lot 2 that had sign panels for Lot 3. None of this is a surprise to her. The special warranty deed itself references these things. So that creates one sense of permission and authorization and awareness. The other issue is that when staff applies the fire code and the building code, Ms. Im, beginning in 2018, says, well, your fire system is illegal. I'm sorry. We have had occupancy for 12 years across the center. We had building permits. We have fire and life safety permits for construction, all separate permits that were all applied according to the ordinances in effect at the time of construction. At no time was there ever a code violation noticed to REN 2. Not once during the course of our operation of the center. The only time those code violations hit was when Ms. Im knew that when she disconnected our suppression system and our alarm system that we would have violations issued. She went to court to ask for permission to do that, though, correct?  She tried to get the court's blessing. She did not. She did it on her own. Well, you asked for a TRO. We did. And it was denied. It was denied on issues that did not relate to the substance. That was not decided during the TRO. When Judge Fullerton addressed the TRO, he was addressing other elements under the four standards. What is our remedy? He said, it sounds like you're going to have a damages remedy if she does it. But he didn't stop her. You spoke directly to Judge Fullerton and asked him to prevent her from doing what she eventually did, correct? We asked Judge Fullerton to stop her from acting, yes. And he did not. And he did not. He did not. But that is a temporary restraining order request, and she went and did it on her own at her own risk. And Judge Fullerton, in his ruling, if you were to review the transcript from that hearing, Judge Fullerton warned her. Judge Fullerton was very careful and said, this is a TRO. You obviously have things to do. I'm available to talk about resolution, but, you know, proceed at your own risk. This matters getting scheduled for discovery and everything else, and we're still at issue. So when she acted, we ended up in a position where we get four citations from the city of Naperville. And we had to respond to those. We incurred between $60,000 and $70,000 in damages, I believe. The judge properly awarded those at trial. And again, this is a bench trial. All right. Ms. M, during her argument for ENS, addressed a lot of matters that this court sitting in review, when it comes to fact, Judge Hayes sitting at bench trial observing the witnesses, including Ms. M, and including the Naperville witnesses, makes the conclusions of fact. And there's nothing here that is clearly erroneous based on the record. From occupancy and permitting all the way through disconnection, it's very clear that we benefited from those utilities. On the sign easement, the facts there are uncontested. There is a sign benefiting Lot 3, RENT 2's property that is situated on ENS's property. The sign easement arises in Exhibit D-12, I'm sorry, it's Exhibit D-11 and P-13. That's the final PUD plat for Waterside Center from 2003. Throughout all the platting, rectangles indicate signs. In the initial PUD for Menards, a rectangle is called out with Menard's sign. In the 2003 Waterside Center PUD plat where they created Lots 2 and 3 with Lot 3, our lot, having a bank and a drive-thru, the signs across the front of the property are indicated with rectangles. In fact, if we're addressing summary judgment, and I don't think you should, that issue merged with trial, and I can address that if you have other questions on it, we said it in our brief. But one of the affidavits submitted in support of summary judgment was an affidavit that attached a site plan from the lease between the Lot 2 owner and Michaels, the craft store. That they have is their largest tenant. And that's at C-7611 in Volume 9 of the record. We actually copy and paste it into page 68 of our brief. This is a lease that E&S has with Michaels by way of their purchase. There's a circle around the sign on Lot 2 that says Lot 3 sign for Lot 3 building pad. So even they have to acknowledge that that sign is for Lot 3, even though it's on Lot 2. It's connected to the Lot 3 building. That is uncontested. There's a line drawn in the plat that we've highlighted. Again, there are portions of the brief that we give you the history on. It's very important to keep in mind The sections of the brief at pages 7 to 14, it gives you the whole history. But pages 164 to 167 of the appendix will zoom in on these plats from the record, because you can't look at the plat and easily see some of this language. Your time is up. You're going to have five minutes in rebuttal. Are there any questions? No, not at this time. Thank you. Mr. Daniel, I'm just struggling to look. So P-167, excuse me, A-167, is that what you're referring to? Yeah, A-167. I just don't have the skills to make it big enough for me to see what you're asking for. This is the circle, correct, on the sign? The circle on the sign is on page 68 of our brief. All right. Why don't you look for that? I just want your best illustration of what you were describing. But I'm going to turn it back over to Ms. M right now, and you can tell us when you come back for your final five minutes. Ms. M. Okay, just to start off with, trespass is not merely just the entry. Once title passes, unless there is an easement, if they're there under a license, since Phil Marone gave them permission, even if he did, there's no evidence of it, but even if he did, acting on behalf of Run 1, gave them permission, again, there's no evidence of that, that it is at best a license. And that license terminates upon the transfer of title. And if you stay on the property after your license terminates, that's trespass. Trespass isn't just the mere entry. It's the invasion of the owner's exclusive right to use that property. And so you have to have an easement. And they're saying that they have an easement under Section 582. And we disagree. They refer to the fire suppression system and the fire alarm control panel and the water and electricity flowing from them as, quote, a shared utility. It's a shared utility because they attach to ENS's building. It's not a shared utility because we commonly own it, that there's an easement where there's an agreement where we agree to give them access to it. It's shared because ENS's predecessor constructed the building first. They installed the fire suppression system. They installed the sprinkler system, the fire alarm control panel, and a year plus later, Run 2 acquired Lot 3. Their sprinkler permit application shows connecting to the, quote, existing fire suppression system, the, quote, existing hydraulic riser system. So when Mr. Daniels refers to it as a shared system, when the circuit court refers to it as a shared system, again, it's only shared because they connected to it. Our argument is they had no right to connect to it. I mean, that's precisely our point. And, you know, on that, I think that the best way to think about the Section 582 easement is that it's like ingress and egress. Ms. Simms, they had no right. They were given permission. You can't argue license and then not argue license. Were they given permission? What I'm saying is that, at best, the record doesn't show that at any time Mr. Marone acted on behalf of Run 1 to give them permission. But what I'm saying is that even if they did, it would be a license. There's no contract. It's under the statute of fraud. I understand that argument, but you were starting to argue that they somehow adversely did this. No, no, I'm not stating that. All I'm saying is that Mr. Daniels' argument that we failed to establish primary phase C trespass is just not correct. That's the point that I was trying to make, Your Honor. So Section 582 is like an ingress-egress rights for utility lines. So, for example, the city's water main is on the other side of your neighbor's property. The utility easement gives you the right to run a pipe across your neighbor's property to bring the water from the city main to the building, right? The conventional easement is the right to travel across your neighbor's property without it being trespassed. The water pipe is like the car used for the transit, but it doesn't give you the right to use the car, right? So if the fire suppression system, as Mr. Daniels says, takes the water from the main, and there is a pipe that's installed by Lot 2 from the Lot 2 building to the Neighborville fire main, right, that goes from the water main that we connected into our building, then that water, Mr. Daniels said, flows through our equipment and into their building. Well, they are required to install their own. It's a utility line at best, and they are required under the declaration to install their own. They can't claim a right to it just because it's a shared system just by connecting to it. On the Michaels lease, it's their resort to, under easement law, in order to find a grant of easement, the granting document, again, because it's a statute of frauds issue, it has to be in writing in a document, and the granting document has to clearly evidence the intent to confer an easement. That clearly confer means that you can't look to extrinsic evidence. If you have to look to extrinsic evidence to find the grant, then that means that there is no grant. Now, I do understand that courts look to extrinsic evidence to interpret the scope of the grant, but you can't look to extrinsic evidence to find the grant because that by itself means that the granting document is ambiguous. Thank you. Your time and rebuttal is up. And Mr. Daniel, you will have 5 minutes for a final rebuttal on your cross appeal. And starting 1st, I would ask. You don't have an easement correct. You don't have you don't have an expressed written easement. Correct. We do. Where do I find that? You find that in exhibit number P14. I'm sorry, P13 and D11. This is the document that is attached as A165 in the appendix. So, at A165, you see a zoomed in portion of the plan of planned unit development for the Waterside Center. 164 shows the cover page. A165 has. We have it now. So, A165, and where am I looking at A165? If you take a look at the top of A165, there's a rectangle below the words privately maintained.  That rectangle is a sign. It is connected from the north side of the rectangle, the upper side, via a line that runs through the letters UE for utility easement. And it turns south towards the building. And it takes a sharp turn in front of the building. Before it connects to the lot 3 building. The language on that route says one 4 inch PVC conduit. So, your conduit goes from your lot 3 to the sign. And that is a picture of your easement, I guess. Is that what you're saying? That is the granting instrument. That is a plat that was recorded by the owner, subdivider, and declarant. Before any sale of any lot. And the issue that we faced was that even though Judge Hayes denied summary judgment and in her order. Denying summary judgment in January of 24, she cites numerous cases. That say easements don't have to carry particular language. You don't need to have granting language in every easement. The intent has to be apparent from the document. This is a plat. There are lines drawn to a particular location. Connecting the building to the sign. And it shows the sign on lot 2 with the note saying that line is PVC conduit for the lot 3 sign. Now, if you think about it, these documents are recorded in sequence. This plat is recorded before the plat of easements. One document number off. Following that, one document beyond the plat of easements is the declaration. The declaration itself approves the sign locations using the same rectangular feature. And identifying them as signs. So, we do have the granting document as a plat. And if you had to think about the resulting situation, if every plat had to have granting language in detail. Take a look here for just below that. Parking for lot 3 is shown on lot 2. 23 spaces. Should we have granting language for that? This is a 15 to 17 acres shopping center. So, there was some reference to a. Document to be recorded later or not attached to something like that. I recall. So, if you, if you take a look at. Let's see here. It's. A 167. Would show you the bottom of the plan unit development. Plat for water side center. One of their arguments is. That proposed future easements were never granted. They were only granted for certain things. If you compare the language for the parking and the language for the sign. There's no word proposed next to it. The proposed easements. Are to non successors entitled people that will not own these are public utility easements. And you can see that at a 167 at the bottom. Proposed P. U. N. D. E. that is a proposed public utility and drainage easement. And it says proposed. When were those carried forward? Those are public easements. When were those carry forward the very next recorded instrument? The plan of easement is all public easements for people that are not owners within the subdivision claiming rights to the plat. And that is the distinction that I believe judge Hayes missed. And that is. Trying to seize on and it's brief. The court should not allow that because there are different instruments for different purposes. The earlier plat. P13 was between the owners of lots 1 and 2. The later plant, the grant of easements was between lots 1, 2, and 3. It applies to Daniel. Your time is up. If you want to wrap up. If I can, I just want to. Note that summary judgment denial was appropriate in this case, it merged. There are factual issues that judge Hayes clearly identified. Under the circumstances, we are asking that you. Award attorneys fees, I think that is self explanatory. You've heard a lot about fire suppression and life safety. Thank you for your time. Thank you questions from the panel. Yes, I had a question for Ms. M. From her rebuttal with regard to, could you address Mr. Ritter's testimony with regard to the fire safety and the location. Issues that were raised, I think that. That what he testified to is that having the 2 meters, the, the electric panel meters, because it has shut off. Next to each other that it's, it's they, it's nice to have them be close together so that you can do that, but it's not. It, it's not a something that would. Would require you to put them close together. For example, they saying that it's nice to have them available to. All the tenants in the event of a fire, so that you don't have to go into the other property to shut off something that's impacting your property. Justice Davenport, if I may. So, the, the, the lot to the property has 2 transformers. 1 is for the, the Michael's section of the building, and they have their own transformer and that transformer is actually around the corner on the other side of the building. With the meters around the other side of the building. So, so even when you have 2 adjoining sections of a building on a single property, it's not such an important consideration to have the 2 meters close together. They could, if it was an important consideration, they would have put the 2 transformers next to each other. They were building from a vacant lot. Okay, thank you. 1 other question that I had was your position is that maintained its obligations to maintain its improvements. Correct? It meant that it meant its obligation to maintain its improvements. Yes, your honor. I'm not sure. Well, do you think the removal of the fire safety is classified as maintaining. It's improvements. How is how is the removal maintaining? Because our fire suppression system was not impacted. We had when when it was disconnected, the fire department came and they inspected the fire suppression system and our building was completely protected. So, okay. Thank you. Thank you. Any questions. Thank you. Mr. Daniel, I have just 1. Question or clarification, so you would acknowledge that whatever electricity that your fire suppression system and whatever water. That your fire suppression system used either for tests. Or if it was ever enacted would be something that. Miss M was paying for, or her client was paying for, I should say. Her client, the facts show that her client. Was paying for it, there's no proof of what they were paying for it. But I, there's somebody getting billed. It's not as if we're taking a resource from them. So, it's not a profit, which is 1 of the arguments that was addressed below a profit of. Okay, thank you. There being no further questions, I appreciate the spirited arguments a very interesting topic and thank you very much council. We will take this under advisement and issue a written decision in due course.